**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 4:24 CR-00287-O |
| | § | |
| STEPHANIE HOCKRIDGE, a/k/a | § | (02) |
| STEPHANIE REIS, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT'S MEMORANDUM**
**IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL**

i

## TABLE OF CONTENTS

Table of Authorities .................................................................**Error! Bookmark not defined.**

Summary and Introduction ..................................................................................... 1

Legal Standard ........................................................................................................ 3

Discussion ............................................................................................................... 4

   I.   The Government Failed to Prove the Conspiracy Charged in Count One Beyond a Reasonable Doubt ........................................................................................... 4

     A.   The Government Failed to Prove the Single, Unified Conspiracy Charged in the Superseding Indictment ..................................................................................... 5

     B.   The Government's Fifth Amendment Violation Caused Substantial Harm ................ 10

     C.   *Vargas-Ocampo* Does Not Remedy the Government's Fifth Amendment Violation .. 11

     D.   The Government Failed to Prove Beyond a Reasonable Doubt That Ms. Hockridge Knowingly Agreed to Join Any Conspiracy ........................................................ 12

     E.   The Government Failed to Prove Beyond a Reasonable Doubt That Ms. Hockridge Submitted a Knowingly False Loan Application for Body Politix LLC ............................ 17

     F.   The Government Failed to Prove a Pattern of Materially False Loan Applications ..... 19

   II.  The Government Failed to Prove the Wire Fraud Charges Beyond a Reasonable Doubt . 21

     A.   The Government Failed to Prove a Unified Scheme to Defraud ................................. 22

     B.   The Government Failed to Prove that Ms. Hockridge Knew That PPP Loan Applications Were Materially False ..................................................................... 23

     C.   The Government Has Failed to Prove That Ms. Hockridge "Caused" Any of the Wire Transfers Described in Counts Two Through Five ............................................... 27

   III. The Government Has Failed to Prove Venue on Any of the Counts ................................ 28

     A.   The Government Failed to Prove Venue Is Proper for the Conspiracy Count, Thereby Entitling Ms. Hockridge to Acquittal on That Count ........................................ 28

     B.   The Government Has Likewise Failed to Demonstrate Venue for Any of the Wire Fraud Counts ............................................................................................... 32

Conclusion ............................................................................................................ 34

i

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brooks v. United States,*
    164 F.2d 142 (5th Cir. 1947) ............................................................5, 10

*Jackson v. United States,*
    328 U.S. 750 (1946).........................................................................3

*Kotteakos v. United States,*
    328 U.S. 750 (1946).....................................................................4, 9, 10

*Kousisis v. United States,*
    145 S. Ct. 1382 (2025)....................................................................23

*Loughrin v. United States,*
    573 U.S. 351 (2014)....................................................................32, 33

*Neder v. United States,*
    527 U.S. 1 (1999).......................................................................22, 32

*United States v. Boyd,*
    478 F. App'x 826 (5th Cir. 2012) .........................................................15

*United States v. Camiel,*
    689 F.2d 31 (3d Cir. 1982).............................................................21, 22

*United States v. Capistrano,*
    74 F.4th 756 (5th Cir. 2023) .............................................................11

*United States v. Cornet,*
    195 F.3d 776 (5th Cir. 1999) ............................................................30

*United States v. Davis,*
    666 F.2d 195 (5th Cir. 1982) ............................................................28

*United States v. Elliot,*
    571 F.2d 880 (5th Cir. 1978) ...........................................................6, 9

*United States v. Fahra,*
    643 F. App'x 480 (6th Cir. 2016) .......................................................5, 6

*United States v. Fells,*
    78 F.3d 168 (5th Cir. 1996) .............................................................27

*United States v. Ganji,*
    880 F.3d 760 (5th Cir. 2018) ...................................................1, 4, 12, 14, 15, 17

*United States v. Garcia Mendoza,*
    587 F.3d 682 (5th Cir. 2019) ...................................................................28

*United States v. Gengler,*
    No. 1:08-cv-12, 2009 WL 5549225 (E.D. Va. Oct. 23, 2009) ...............................22

*United States v. Holloway,*
    377 F. App'x 383 (5th Cir 2010) .............................................................12

*United States v. Hoover,*
    467 F.3d 496 (5th Cir. 2006) ....................................................................5

*United States v. Jones,*
    733 F.3d 574 (5th Cir. 2013) ....................................................................6

*United States v. Miles,*
    360 F.3d 472 (5th Cir. 2004) ..................................................................30

*United States v. Morris,*
    568 F.2d 396 (5th Cir. 1978) ..................................................................26

*United States v. Nicosia,*
    360 F. Supp. 814 (N.D. Ind. 1973) ...........................................................16

*United States v. Owens,*
    724 F. App'x 289 (5th Cir. 2018) .............................................................28

*United States v. Perez,*
    223 F. App'x 336 (5th Cir. 2007) .............................................................31

*United States v. Rodriguez-Lopez,*
    756 F.3d 422 (5th Cir. 2014) ..................................................................29

*United States v. Skillern,*
    947 F.2d 1268 (5th Cir. 1991) ................................................................14

*United States v. Starks,*
    515 F.2d 112 (3d Cir. 1975)......................................................................9

*United States v. Strain,*
    396 F.3d 689 (5th Cir. 2005) ...........................................................28, 29, 32

*United States v. Swafford,*
    512 F.3d 833 (6th Cir. 2008) ................................................................5, 6

*United States v. Taglia*,
    922 F.2d 413 (7th Cir. 1991) ..................................................................16

*United States v. Thomas*,
    690 F.3d 358 (5th Cir. 2012) ..................................................................28

*United States v. Vargas-Ocampo*,
    747 F.3d 299 (5th Cir. 2014) (en banc) ..............................................10, 11

*United States v. Varkonyi*,
    611 F.2d 84 (5th Cir. 1980) ......................................................................3

*United States v. Velencia*,
    600 F.3d 389 (5th Cir. 2010) ..................................................................22

*United States v. White*,
    569 F.2d 263 (5th Cir. 1978) ......................................................12, 14, 17

*United States v. Wieschenberg*,
    604 F.2d 326 (5th Cir. 1979) ..................................................................31

*United States v. Williams*,
    20 F.3d 125 (5th Cir 1994) ........................................................................3

*United States v. Winship*,
    724 F.2d 1116 (5th Cir. 1984) ................................................................27

*United States v. Xu*,
    599 F.3d 452 (5th Cir. 2010) ....................................................................3

*Universal Health Services v. United States ex rel. Escobar*,
    579 U.S. 176 (2016)..........................................................................22, 23

**Constitution, Statutes, and Regulations**

U.S. Const. amend. V.........................................................2, 4, 5, 9, 10, 21

U.S. Const. amend. VI ........................................................................27, 31, 32

18 U.S.C. § 1343.........................................................................................33

*Business Loan Program Temporary Changes; Paycheck Protection Program as
    Amended by Economic Aid Act*, 86 Fed. Reg. 3692, 3694–95, 3708 (Jan. 14,
    2021) ......................................................................................................24

Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act, Pub.
    L. 116-260, §305, 134 Stat. 1182, 1996–97 (Dec. 27, 2020) (codified at 15
    U.S.C. § 636m(h)(2)) ............................................................................24

**Rules**

Fed. R. Crim. P. 18 .................................................................................................28

Fed. R. Crim. P. 18 .................................................................................................31

Fed. R. Crim. P. 29 ...................................................................................................3

Fed. R. Evid. 801 ............................................................................................10, 30

**Other Authorities**

LaFave, Israel & King, *Criminal Procedure* § 16.3(f) (2d ed. 1999)...........................................31

## SUMMARY AND INTRODUCTION

Between 2020 and 2021, Blueacorn served more than 700,000 borrowers. *See* 6/13 Tr. 299:17–299:21.[1] In 2021, VIPPP served nearly 2,000 borrowers. Yet the Government has introduced just a tiny sliver of the applications submitted through Blueacorn and VIPPP in a vain effort to prove that Ms. Hockridge conspired to commit PPP fraud. Even that sliver has been found wanting. The Government introduced no smoking gun: although it introduced communications indicating that ***other people*** may have conspired to commit fraud, the Government's vast trove of documents in this case yielded vanishingly little as to Ms. Hockridge. Instead, the Government has relied on the uncorroborated say-so of Eric Karnezis—a proven, prolific liar—and other witnesses who ultimately admitted that they had no evidence that Ms. Hockridge ever entered into a conspiratorial agreement. As the Court's jury charge instructs, the jury may not "convict upon the unsupported testimony" of an "alleged accomplice" unless the jury finds such testimony "credible beyond a reasonable doubt." Jury Charge at 7. If the jury follows the Court's instruction, it would have no choice but to acquit. This Court should not put the jury through the trouble.

The Government has also relied on the insinuations that Ms. Hockridge must have known about fraudulent applications submitted by her husband and his alleged coconspirators. But Ms. Hockridge is her own person. *United States v. Ganji*, 880 F.3d 760, 767–68 (5th Cir. 2018) ("Mere similarity of conduct among various persons and the fact that they have associated with or are related to each other is insufficient to prove an agreement."). The Government has not presented evidence sufficient to convince a rational jury beyond a reasonable doubt that she is guilty of anything but unwittingly associating with business partners who turned out to be fraudsters. Likewise, as the undisputed evidence established, the applicable regulations encouraged Ms.

---

[1]    All citations are to the daily rough transcript.

1

Hockridge and all other actors participating in the PPP application process to rely on the borrowers themselves to submit applications that were "true and accurate in all material respects." 6/13 Tr. 272:15–19 (Zelaya). On such anemic evidence tying Ms. Hockridge to the criminal acts of her alleged coconspirators, a rational jury could not conclude, beyond a reasonable doubt, that Ms. Hockridge is guilty of any count of the Superseding Indictment.

But its failure to submit sufficiently persuasive evidence of Ms. Hockridge's guilt is just the beginning of the Government's failings. As Ms. Hockridge extensively argued in her motion to dismiss, the Superseding Indictment charged Ms. Hockridge with a single, unified conspiracy and scheme to defraud. Mtn. to Dismiss (Doc. #91); Renewed Mtn. to Dismiss (Doc. #180). Yet based on the evidence adduced at trial, a rational jury could not conclude that any such unified conspiracy or scheme existed; instead, the evidence showed that were at least two separate courses of conduct here, if not many, many more. Those courses of conduct were divided between entirely different rounds of the PPP—rounds that were ***five months apart*** and subject to separate laws and regulations—and also involved different operations, scales, and participants. As the evidence further demonstrated, there was no interdependence among the majority of the borrowers whose loan applications the Government has alleged (without sufficient evidence) to be fraudulent—and in all but a few cases, not even any contact with Ms. Hockridge. Instead, the Government's proof has shown a "hub and spoke" conspiracy without a "rim," which, as the Supreme Court has held for more than 70 years, means the Government's proof, even viewed it the light most favorable to the prosecution, established a multitude of separate conspiracies, not a single conspiracy. The Government's proof therefore represents an impermissible constructive amendment to and variance from the charges of the Superseding Indictment, in violation of the Fifth Amendment.

Finally, and fatally, the Government has failed to establish venue. That is because it did not introduce evidence that any coconspirator performed an act in furtherance of a conspiracy in the Northern District of Texas. At best, it has located Ms. Hockridge or another alleged coconspirator in this District while the alleged conspiracy was ongoing. But mere presence, without proof of an accompanying act in furtherance of the conspiracy, is not enough to establish venue. Likewise, the Government's evidence demonstrated that any acts allegedly undergirding Counts Two through Five took place in Arizona, not in the Northern District of Texas. Ms. Hockridge therefore respectfully requests that the Court grant her motion for judgment of acquittal on each count of the Superseding Indictment.

## LEGAL STANDARD

Under Rule 29, after the Government closes its evidence, "the [C]ourt on the defendant's motion must enter a judgment of acquittal on any offense for which evidence is insufficient to sustain a conviction." The fact that there is "some evidence" to suggest the defendant's guilt is not enough. *See Jackson v. Virginia*, 443 U.S. 307, 320 (1979) (holding that the existence of "some evidence" supporting a charge "is simply inadequate to protect against misapplications of the constitutional standard of reasonable doubt"); *see also id.* (finding that it cannot "seriously be argued" that the mere presence of evidence "that has any tendency to make the existence of an element of a crime slightly more probable than it would be without the evidence . . . could by itself rationally support a conviction beyond a reasonable doubt.").

Instead, in determining the sufficiency of the evidence, the "relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime ***beyond a reasonable doubt***." *United States v. Xu*, 599 F.3d 452, 453 (5th Cir. 2010) (cleaned up) (emphasis added). For that standard to be

3

satisfied, it is not enough that the evidence merely be ***consistent*** with a Defendant's guilt, because that would not satisfy the reasonable doubt standard. *See United States v. Varkonyi*, 611 F.2d 84, 85 (5th Cir. 1980). Instead, the question is whether, assuming the jury believes the evidence submitted by the Government to be true, whether it is so strongly reflective of guilt that it would leave a rational factfinder "firmly convinced of a defendant's guilt," without any "real possibility" that the defendant was innocent. *United States v. Williams*, 20 F.3d 125, 128 (5th Cir 1994). In this case, the Government has fallen short of that mark.

Moreover, a "conviction may not rest on mere suspicion, speculation, or conjecture, or an overly attenuated piling of inference upon inference," nor can it "rest on an unwarranted inference, the determination of which is a matter of law." *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018) (cleaned up). But despite its blundering attempts to convict Ms. Hockridge based upon her mere association with her husband and his confederates, "inference upon inference" is all that the Government's case amounts to at the end of the day.

**DISCUSSION**

## I.    The Government Failed to Prove the Conspiracy Charged in Count One Beyond a Reasonable Doubt

The Superseding Indictment's Count One alleged a single, unified conspiracy to commit wire fraud by submitting falsified PPP loan applications or helping others do the same. Superseding Indictment (Doc. #163) ¶ 14. The Government has failed to prove that charge beyond a reasonable doubt.

To begin, the Government has not presented evidence of a single, unified conspiracy. At best, it has proven (at least) two, distinct courses of conduct in 2020 and 2021—divided between different PPP rounds, which were subject to different laws and regulations, and separated by a five-month closure of the PPP. At worst, it has proven "hub-and-spoke" courses of conduct with a

4

multitude of borrowers and loan processors who were not interdependent. The Government has therefore committed the precise error that the Supreme Court found fatal in *Kotteakos v. United States*, 328 U.S. 750 (1946). In short, the Government's deviation from the Superseding Indictment represents an impermissible constructive amendment, or alternatively a fatal variance, in violation of the Fifth Amendment.

But even if the evidence were capable of establishing a single conspiracy beyond a reasonable doubt (which it is not), the Government has failed to prove beyond a reasonable doubt that Ms. Hockridge agreed to join any conspiracy at all. Indeed, the Government's very first witness distanced Ms. Hockridge from any conspiracy, and other Government witnesses confirmed that she took steps to ***undermine*** any conspiratorial aims—not to join them. Thus, even if the Government's witnesses were believed, no rational jury could conclude ***beyond a reasonable doubt*** that she joined in their conspiracy.

### A. The Government Failed to Prove the Single, Unified Conspiracy Charged in the Superseding Indictment

"The Fifth Amendment provides for criminal prosecution only on the basis of a grand jury indictment." *United States v. Hoover*, 467 F.3d 496, 500 (5th Cir. 2006) (cleaned up). Thus, once a grand jury returns an indictment, only the grand jury may amend it. *Id.* The Government violates the Fifth Amendment by seeking a conviction on a "materially different theory or set of facts than that with which [the defendant] was charged" in the indictment. *Id.* (cleaned up); *see also id.* at 502 ("Therefore, we conclude that because the indictment charged Hoover with making one false statement, and the jury instructions allowed the jury to convict him for making a different false statement, the trial court constructively amended Hoover's indictment.").

In particular, the Government may not obtain an indictment that charges a single, unified conspiracy and then seek a conviction by proving multiple conspiracies. *Brooks v. United States*,

164 F.2d 142, 143 (5th Cir. 1947) ("[W]hile it would have been entirely permissible to have tried all these persons and all these conspiracies together in one indictment in several counts . . . it was reversible error to send them all to the jury under an indictment in one count charging one conspiracy."): *see also id.* ("[D]ue process as to each defendant required for a conviction that the evidence be strong enough to exclude every other reasonable hypothesis than the guilt of that defendant on the ***precise conspiracy charged***." (emphasis added)); *United States v. Swafford*, 512 F.3d 833, 842 (6th Cir. 2008) (holding that, because the Government "failed to prove" the single charged conspiracy and, "there [was] a variance between the crime charged (a single conspiracy) and the crime proved (multiple conspiracies)"); *United States v. Fahra*, 643 F. App'x 480, 490 (6th Cir. 2016) ("Specifically, when the indictment alleges a single conspiracy but the evidence at trial shows multiple conspiracies, the variance between the indictment and proof, if it is prejudicial, is reversible error.").

Multiple factors determine whether a course of conduct represents one, or rather multiple, conspiracies. Courses of conduct represent separate conspiracies if they occur at separate times, as well as if the "manner and means" of the conspiracies differ. *Fahra*, 643 F. App'x at 492–93. So too when the supposed conspirators do not share a single goal or are "not truly interdependent[,] or where the various activities sought to be tied together cannot reasonably be said to constitute a unified scheme." *United States v. Elliot*, 571 F.2d 880, 901 (5th Cir. 1978); *Swafford*, 512 F.3d at 842 ("The government failed to prove that the methamphetamine cooks were acting in furtherance of a common goal or that there was any significant interdependence among them."); *see generally United States v. Jones*, 733 F.3d 574, 580–81 (5th Cir. 2013) (identifying factors for identifying multiple conspiracies for purposes of double jeopardy).

Here, all of those factors point to the same conclusion Ms. Hockridge urged in her earlier motion to dismiss Count One of the Indictment (Doc. #91): at best, the Government has presented evidence of two or more separate courses of conduct—not a single, unified conspiracy—which represents a fatal constructive amendment, or alternatively a fatal variance, from the Superseding Indictment's single-conspiracy charge. As detailed below, the two courses of conduct occurred in distinct times; involved different operations and scales; and involved different participants. The evidence simply would not allow a rational factfinder to find a single conspiracy as charged in Count One beyond a reasonable doubt.

### 1.    The Evidence Shows at Least Two Courses of Conduct at Two Different Times

As the Government's SBA witness Ms. Zelaya testified, the Paycheck Protection Program had two distinct rounds: PPP Round 1 began on April 3, 2020 and ended on August 8, 2020. 6/16 Tr. 248:16–249:9; *see also* 6/12 Tr. 52:24–53:3 (Flores testifying that PPP funding ran out in August 2020). For *five months* thereafter, the SBA accepted no PPP applications whatsoever. 6/16 Tr. 249:7–249:24 (Zelaya). PPP Round 2 did not begin until January 2021, after Congress passed a new law and new funds began to flow to borrowers. *See* 6/12 Tr. 64:13–64:22 (Flores testifying that Congress passed another PPP round in approximately December 2020, and funding began flowing in the middle of January 2021).

This second PPP round was not just a repeat of the first: Under the first set of PPP laws and regulations, banks had lent primarily to their existing clients, leaving small businesses (especially sole proprietors and independent contractors) out in the cold. *See* 6/12 Tr. 139:3–139:16 (Flores). During the second round of PPP, however, the rules made it easier for applicants to apply for PPP loans and also incentivized lenders to originate more PPP loans by paying a higher fee, including a significantly higher fee for smaller loans. 6/12 Tr. 65:2–65:12 (Flores).

These two, distinct PPP rounds necessarily divide this matter into at least two, distinct courses of conduct. As of August 8, 2020, PPP funding had dried up, and it was uncertain whether Congress would authorize additional funding. *See* 6/16 Tr. 249:7–249:24 (Zelaya). As of that date, therefore, any course of course of conduct related to obtaining PPP loans necessarily ended. Matters lay dormant for ***five months*** thereafter, until Congress finally authorized new PPP funding, which began to flow in January 2021. The second course of conduct overlapped with this second PPP Round.

### 2.    The Two Courses of Conduct Differed in Scale, Manner, and Means

Time was not all that divided these separate courses of conduct. The business itself differed fundamentally in 2020 and in 2021. In 2020, because the first PPP round favored banks' existing clients, the universe of potential borrowers was necessarily smaller, and so loan processors like Blueacorn had fewer opportunities to help prospective borrowers obtain loans. Hence, Blueacorn's operations were limited during that initial round: participants merely obtained loans for themselves and their direct contacts. *E.g.*, 6/12 Tr. 52:2–52:16 (Mr. Flores testifying that in 2020 he submitted a false loan application with the help of Michael Cota and Nathan Reis). The second course of conduct, however, coincided with greater borrowing opportunities for small businesses and sole proprietors—thus expanding the opportunities for loan processors like Blueacorn to help. As a result, operations expanded dramatically in 2021, with Blueacorn growing to approximately 25 to 40 people. (6/12 Tr. 99:20–99:24) (Flores).

### 3.    The Two Courses of Conduct Had Different Participants

In addition to timing, scale, manner, and means, the two courses of conduct also involved different participants. Most notably, Ms. Hockridge played a limited role in the 2020 conduct—so much so, that Government witness Mr. Hochberg testified that Ms. Hockridge was involved in the conspiracy in 2020, 6/16 Tr. 313:9–11. Conversely, Government witness Eric Karnezis was not

involved in the 2020 course of conduct. 6/12 Tr. 283:24–284:1 (Mr. Flores testifying that Mr. Karnezis was not part of the same conspiracy). And Blueacorn itself was different, too: During the second course of conduct, the Blueacorn tradename applied to a new entity, Fin Cap, which took on a new role as a lender service provider. (6/12 Tr. 64:7–64:12; EX26).

In sum, a rational factfinder could not conclude, beyond a reasonable doubt, that the Government has proven a single, unified conspiracy. The evidence shows at least two distinct courses of conduct, which occurred during different PPP rounds, entailed different scales and types of operations, and involved different constituents.

### 4. The Government Has Failed to Demonstrate Any Interdependence Among the Borrowers, as Would Be Required to Make Them Part of a Single Conspiracy

Proving two distinct courses of conduct is the best-case scenario for the Government. But in fact, the Government has proven as many distinct courses of conduct as there were borrowers who worked with Blueacorn and VIPPP. The Government proves multiple, distinct courses of conduct when it proves that a central person deals with a host of other individuals who do not know about one another and who are not interdependent. *Kotteakos*, 328 U.S. at 754–55 ("[T]he pattern was 'that of separate spokes meeting a common center,' though we may add without the rim of the wheel to enclose the spokes. The proof therefore admittedly made out a case, not of a single conspiracy, but of several . . . ."); *Elliot*, 571 F.2d at 901 (holding that in a "chain conspiracy," the "scheme which is the object of the conspiracy must depend on the successful operation in each link of the chain"). Such is the case here. Several of the individuals who submitted, or helped submit, fraudulent PPP loans through Blueacorn and VIPPP were not even aware of each other. The Government's first witness Mr. Flores testified that he was unaware that Eric Karnezis was a member of any conspiracy. 6/12 Tr. 283:24–284:1. Nor did the successful operation of Blueacorn or VIPPP depend on the "successful operation of each link of the chain." *Elliot*, 571 F.2d at 901.

The Government has not shown that one borrower's loan application affected another's—or that one loan processor's work affected another's. In short, a rational factfinder could not conclude, beyond a reasonable doubt, that the Government has proven a single, unified conspiracy.

### B.  The Government's Fifth Amendment Violation Caused Substantial Harm

The proof's deviation from the Superseding Indictment has caused, and will cause, substantial prejudice to Ms. Hockridge. Most glaringly, the deviation poses a problem for the jury's verdict. The Superseding Indictment requires the jury to vote on a single conspiracy count. But the Government has proven at least two, distinct courses of conduct—and in fact, many, many more—not a single, unified conspiracy. A general verdict against Ms. Hockridge on the single conspiracy count will not reveal whether the jury concluded unanimously that she was part of one course of conduct versus another. *See United States v. Starks*, 515 F.2d 112, 116 (3d Cir. 1975).

Another source of prejudice is Ms. Hockridge's indisputably limited involvement in the 2020 course of conduct, *see, e.g.*, 6/12 Tr. 128:22–129:2, 156:21–157:4, 175:25–176:13; 6/16 Tr. 313:9–11. Because her role was so limited—and because the Government consistently failed to prove that she knew about any fraudulent loans in 2020, a rational jury could not conclude, beyond a reasonable doubt, that she agreed to join any conspiracy in 2020.

The Government has tried this case, however, as if Ms. Hockridge was a member of all conspiracies, spanning 2020 and 2021. The Government has introduced ample evidence—such as through Mr. Flores—of conduct from 2020, primarily attributable to Mr. Flores, Mr. Hochberg, and Ms. Hockridge's husband . That evidence includes hearsay introduced under the exception for coconspirator statements—even though Ms. Hockridge was not a member of the relevant conspiracy. *See, e.g.*, 6/12 Tr. 317:2–323:10 (admitting July 2020 email between Oliver O'Connell and Nathan Reis, including partially for the truth of the matter asserted, under the Rule 801 exception for coconspirator statements). This introduction of evidence about an alleged conspiracy

10

that did not involve Ms. Hockridge risks "transference of guilt from one to another across the line separating conspiracies, subconsciously or otherwise"—a danger "so great that no one really can say prejudice to substantial right has not taken place." *Kotteakos*, 328 U.S. at 774; *Brooks*, 164 F.2d at 143 ("[T]he trial was conducted too much on the apparent assumption that . . . evidence as to what any of the defendants said or did would be admissible against all of the others.").

### C. *Vargas-Ocampo* Does Not Remedy the Government's Fifth Amendment Violation

In its objections to Ms. Hockridge's proposed jury instructions, the Government argued that Ms. Hockridge could be convicted if the evidence were merely "equally consistent with Ms. Hockridge's guilt as it is with her innocence," and that Ms. Hockridge's proposed instruction to the contrary "tracks the 'equipoise rule,' which the Fifth Circuit has explicitly abandoned." Agreed Charge (Doc. #143) at 15 & n.4 (citing *United States v. Vargas-Ocampo*, 747 F.3d 299, 300–01 (5th Cir. 2014) (en banc)). To the extent the Government argues Ms. Hockridge could be convicted if the Government provided evidence ***consistent*** with a single conspiracy rather than sufficient to allow the jury to find a single conspiracy ***beyond a reasonable doubt***, the Government has misapplied *Vargas-Ocampo*.

The Government's error in reasoning is its conflation of the fact-finding standard at the trial stage with the standard of postconviction ***appellate review*** on a sufficiency-of-the-evidence challenge. *Vargas-Ocampo* held that appellate courts should not reverse a conviction on the grounds that "the evidence construed in favor of the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged." 747 F.3d at 301 (quotation omitted). In context, this holding merely instructs reviewing courts not to make credibility judgments "on a cold appellate record without the benefit of the dramatic insights gained from watching trial." *Id.* But *Vargas-Ocampo* did not, and could not, hold that a ***fact-finder*** could convict a criminal defendant on the basis of evidence the ***fact-finder*** believed was equally

11

probative of guilt or innocence—*i.e.*, it did not lower the reasonable doubt standard below a preponderance standard. *See id.* at 302 (holding that, notwithstanding the court's rejection of the "equipoise" rule, "courts remain empowered to consider . . . whether the inferences drawn by a jury were rational, as opposed to being speculative or insupportable, and whether the evidence is sufficient to establish every element of the crime"). Because the evidence here would not permit a "rational trier of fact [to find] the essential elements of [Count One] beyond a reasonable doubt"— including the existence of a single conspiracy—Ms. Hockridge is entitled to a judgment of acquittal. *See United States v. Capistrano*, 74 F.4th 756, 166 (5th Cir. 2023) (citing *Vargas-Ocampo*, 747 F.3d at 303).

### D. The Government Failed to Prove Beyond a Reasonable Doubt That Ms. Hockridge Knowingly Agreed to Join Any Conspiracy

In addition to failing to prove the unified conspiracy charged in the Superseding Indictment, the Government also failed to prove beyond a reasonable doubt that Ms. Hockridge agreed to join any conspiracy at all. That failure likewise requires a judgment of acquittal on Count One.

To establish conspiracy, "there must be proof beyond a reasonable doubt that a conspiracy existed, that the accused knew it and, with knowledge, voluntarily joined it." *United States v. White*, 569 F.2d 263, 266–67 (5th Cir. 1978) (citation). "Without an agreement, there is no conspiracy." *Ganji*, 880 F.3d at 768 (citation omitted). "[P]roof of an agreement to enter into a conspiracy is not to be lightly inferred." *White*, 569 F.2d at 267 (cleaned up); *see also Ganji*, 880 F.3d at 767–68. Nor is "conscious parallelism or parallel business conduct" sufficient on its own to prove an agreement to join a conspiracy. *United States v. Holloway*, 377 F. App'x 383, 387–88 (5th Cir 2010) (cleaned up). Moreover, one "cannot negligently enter into a conspiracy"; the Government must prove that the defendant "knowingly agreed to participate in a common scheme to meet an unlawful goal." *Ganji*, 880 F.3d at 776.

Based on the evidence adduced during the Government's case-in-chief, a rational trier of fact could not conclude beyond a reasonable doubt that Ms. Hockridge knowingly agreed to join any conspiracy to facilitate fraudulent PPP loan applications. The evidence repeatedly distanced Ms. Hockridge from any such conspiracy. For example, Mr. Flores testified that Nathan Reis kept Ms. Hockridge at a distance because of a disagreement over how to operate Blueacorn, 6/12 Tr. 224:15–226:15; that Ms. Hockridge was not part of the original pitch that Mr. Reis made to Mr. Flores about the Blueacorn idea, 6/12 Tr. 128:22–129:2; that, although Mr. Flores spoke with Mr. Reis often, Ms. Hockridge was often not around, 6/12 Tr. 156:21–157:4; and that, though Mr. Reis and Mr. Cota helped Mr. Flores complete a fraudulent loan application, Ms. Hockridge was not involved in changing any number on the application, 6/12 Tr. 175:25–176:13. Nor did the Government present any evidence that Ms. Hockridge knew that any information on Mr. Flores's applications were false. Instead, as Mr. Flores testified, "Ms. Hockridge was kept in the dark" by Mr. Flores and Mr. Reis. 6/13 Tr. 274:14–274:19. As explained above, moreover, Mr. Hochberg similarly placed Ms. Hockridge at a distance from any fraud, which underscores that Ms. Hockridge could not have knowingly joined a conspiracy to commit fraud.

More to the point, a rational factfinder must conclude that Ms. Hockridge took steps to ***root out fraudulent applications***—thus undermining the very conspiratorial goals the Government ascribes to her. For example:

- Ms. Hockridge hired attorneys named the Warzels—one of whom was a prosecutor—to review loan applications. 6/13 Tr. 194:21–194:5.

- Special Agent Friedemann admitted he has seen documents showing that Ms. Hockridge and others stopped potentially fraudulent loan applications, 6/13 Tr. 156:23–157:4, and that Ms. Hockridge had conversations about preventing fraud, 6/13 Tr. 173:23–174:17.

- Ms. Hockridge removed almost one hundred loans from the VIPPP system when she discovered that they were connected with a known fraudster under the alias "Rick Diamond." 6/16 Tr. 95:22–95:24, 197:10–197:19.

13

Perhaps most perniciously, the Government evidently seeks to have the jury infer merely from Ms. Hockridge's marriage to her husband Nathan Reis that she was aware of his revisions to various borrowers' Schedule Cs and 1099s—despite the lack of any evidence of any communications reflecting such knowledge, and despite the Government's having combed through thousands of pages of their confidential marital communications.[2] But a "conspiracy

---

[2]    The sole exception the Government has introduced is a message Ms. Hockridge sent to Mr. Reis regarding an application for C.B. being rejected because "your photoshop skills weren't very good." That statement is insufficient to sustain a conviction beyond a reasonable doubt for a host of reasons.

First, the timing of the message indicates that, even drawing all reasonable inferences in favor of the Government, Ms. Hockridge learned of the revision to the 1099 *after* it had been submitted. As this Court will instruct the jury, "Mere presence at the scene of an event, *even with knowledge that a crime is being committed*, . . . does not necessarily establish proof of the existence of a conspiracy." Proposed Charge (Doc. #142) at n.34 (emphasis added); *cf. Ganji*, 880 F.3d at 776 ("Again, to prove conspiracy, the Government must prove beyond a reasonable doubt that the defendant knew of and participated in an agreement to commit a crime. It is not enough that the Government proves that the defendant knew something criminal was afoot.").

Second, the Government has not presented evidence that the number in the revised 1099 was not a true number, much less not a reasonable estimate of Mr. Sanor's earnings. As several Government witnesses—including Mr. Flores and Special Agent Friedemann—all acknowledged, multiple borrowers had indicated to Mr. Flores and others that what they had reported to the IRS previously as their income had been understated, and, in the context of a sole proprietorship or self-employed individual, whether money received from one's business should be reported on a 1099, as profit on a Schedule C, or as a distribution to a shareholder was well within the taxpayer's discretion (and are all economically equivalent for tax purposes for any pass-through entity). *See, e.g.*, 6/12 Tr. 243:17–244:13; 6/13 Tr. 197:6–197:10.

Finally, even if it were permissible to infer from the mere revision to such a document that the revised document (as opposed to the original document) is false, the Government has introduced absolutely *no* evidence that Ms. Hockridge was aware that the revised number was not at least a fair estimate of Mr. Sanor's income, or that the documents supporting his application were not true and accurate in "all material respects." *See* Ex. 79A at 2. Since Mr. Sanor would have received the same loan so long as his income was more than $100,000, Mr. Sanor's estimate could have been off by as much as $57,000 and still not be a "material" falsehood. Nor is there any dispute that, as a matter of law, taxpayers are permitted both to amend their returns to correct incorrect information and to file revised 1099s within three years after the submission of their original tax documents. 6/13 Tr. 279:14–21.

14

cannot be proven solely by family relationship or other types of close association . . . . Mere similarity of conduct among various persons and the fact that they have associated with or are related to each other do not establish the existence of a conspiracy." *United States v. White*, 569 F.2d 263, 268 (5th Cir. 1978) (citations omitted); *see also United States v. Skillern*, 947 F.2d 1268, 1273 (5th Cir. 1991) (finding the evidence was insufficient to sustain a conspiracy conviction where the evidence showed nothing more than "that [defendant] associated with members of a drug conspiracy and that one member of that conspiracy speculated that [defendant] might be a member of that conspiracy"). The insinuation that, because Ms. Hockridge and Mr. Reis were married and business partners, is at best the sort of mere "speculation" that is insufficient to sustain proof of guilt beyond a reasonable doubt. *Ganji*, 880 F.3d at 767 (cleaned up).

The Government also expects the jury to infer that Ms. Hockridge agreed to join a conspiracy based on testimony that she was ***around*** supposed fraud. *See* Gov't Filing Concerning Deliberate Ignorance (Doc. #214) (arguing that Ms. Hockridge was deliberately ignorant "to the fraud swirling ***around*** her" (emphasis added)). For example, Mr. Flores testified that Ms. Hockridge was ***in the room*** when her husband, Mr. Reis, allegedly told borrowers they could falsify loan applications (of which Mr. Flores could not provide any examples). (6/12 Tr. 68:3–68:13). But "[a] conspiracy may not be shown . . . by evidence that merely places the defendant in a climate of activity that reeks of something foul." *United States v. Boyd*, 478 F. App'x 826, 829 (5th Cir. 2012) (cleaned up)); *see also* Jury Charge at 14 ("Mere presence at the scene of an event, even with knowledge is being committed . . . does not necessarily establish proof of the existence of a conspiracy.")

The Government also relies heavily on the uncorroborated testimony of Eric Karnezis, but a rational factfinder could not find Mr. Karnezis's testimony sufficiently credible to reach a guilty verdict beyond a reasonable doubt. Mr. Karnezis is, indisputably, a serial liar:

- When he was initially arrested, Mr. Karnezis admits that—contrary to this trial testimony—he told federal agents that Mr. Reis and Ms. Hockridge were on the up and up and had a system to catch fraud. 6/16 Tr. 77:15–77:21.

- He also admitted lying to agents about the first month of his work on VIPPP being legitimate. 6/16 Tr. 154:1–154:6.

- He lied to Mr. Reis about how many employees his business had. 6/16 140:18–140:23, 155:10–155:16.

- He submitted loan-application paperwork to Ms. Hockridge without disclosing to her that he was lying about the size of his businesses. 6/16 Tr. 156:17–156:19.

- He lied to Ms. Hockridge about how many employees an applicant had. 6/16 Tr. 206:20–206:25.

- He pretended to disassociate with a fraudster despite continually associating with that same fraudster. 6/16 Tr. 209:7–209:23.

- Although Ms. Karnezis contends he conspired with Ms. Hockridge to commit fraud, he has no written communications to that effect—despite having messages discussing fraud with Mr. Reis. 6/16 197:20–198:10.

- Mr. Karnezis provided false excuses to Ms. Hockridge for suspicious aspects of the loan applications he submitted. Ex. 35A, at 24-25; 6/19 Tr. 138:4-17.

In short, this lone witness is insufficient to support a verdict beyond a reasonable doubt. *See United States v. Nicosia*, 360 F. Supp. 814, 819 (N.D. Ind. 1973) ("Such affirmative evidence, together with the evidence of defendant's lifetime of good works and excellent reputation, refutes the uncorroborated and impeached testimony of the Government's lone witness against defendant as to the alleged payments."); *cf. United States v. Taglia*, 922 F.2d 413, 415 (7th Cir. 1991) ("If the government's case rested entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly unworthy of being believed because he had lied consistently in

16

a string of previous actions, the district judge would have the power to grant a new trial in order to prevent an innocent person from being convicted.").

### E. The Government Failed to Prove Beyond a Reasonable Doubt That Ms. Hockridge Submitted a Knowingly False Loan Application for Body Politix LLC

The centerpiece of the Government's theory that Ms. Hockridge was part of a PPP fraud conspiracy is the allegation that Ms. Hockridge submitted a fraudulent loan application for Body Politix in June 2020. Superseding Indictment (Doc. #163) ¶ 17(c). The evidence, however, would not allow the jury to find Ms. Hockridge guilty beyond a reasonable doubt as to that loan application. The uncontroverted evidence presented at trial shows that Ms. Hockridge did prepare that loan application, which was instead drafted and submitted by Mr. Reis. *See* Ex. 27A at 1–2 (Mr. Reis asking borrower if he can be an employee of Body Politix to increase the PPP loan amount). Likewise, the Government did not show any evidence from which a jury could conclude that Ms. Hockridge knew of any material falsehoods in the June 2020 loan application at the time the application was submitted. Instead, the Government has merely presented evidence of that Ms. Hockridge discussed the loan application with an underwriter at Prestamos *after* the loan was submitted—a discussion which omitted any mention of the amounts on the loan application the Government (incorrectly) contends to be false. *See* Ex 64H at 16.

To prove conspiracy, the Government must "prove beyond a reasonable doubt that the defendant knew of and participated in an agreement to commit a crime. And it 'is not enough that the Government proves that the defendant knew something criminal was afoot." *Ganji*, 880 F.3d at 766. Because the Government did not present any evidence to show that Ms. Hockridge knew of any decision to make material, false statements on the June 2020 loan application at the time the application was submitted, she could not have agreed to or knowingly assisted in facilitating the false loan application. Thus, once again, the sum total of the Government's positive evidence

17

on this point is Ms. Hockridge's general association with Mr. Reis (*i.e.*, her husband). But "[m]ere similarity of conduct among various persons and the fact that they have associated with or are related to each other is insufficient to prove an agreement." *Id.* at 767–78; *White*, 569 F.2d at 268 (holding that a "conspiracy cannot be proven solely by family relationship or other types of close association" (citation omitted)).

But the Government's failure of proof with respect to the 2020 Body Politix application does not stop there. First, the Government failed to produce any evidence to demonstrate that the loan application was ***materially*** false. As several of the Government's witnesses agreed, any income reported above $100,000 for a sole proprietor like Body Politix did not affect the size of the loan that Body Politix could receive. 6/16 Tr. 273:1–273:6; 6/12 Tr. 149:2–149:19. Second, as the evidence showed, Ms. Hockridge did in fact have more than $192,000 in deposits into her "work" account at Wells Fargo, which, as Special Hagerman acknowledged, she was permitted to use for Body Politix business. 6/18 Tr. 34:24–36:24; 42:20–42:23; Ex. 63B. Finally, the Government did not present any evidence that Ms. Hockridge had an adequate understanding of tax law to know that $96,000 deposited into her "work" account would not qualify as "gross receipts" on a Schedule C.

Similar problems confront the Government as to the "doctored" Wells Fargo bank statement submitted with the Body Politix loan. First, there is no dispute that Body Politix was an existing entity at the time of the 2020 application, having been incorporated in 2016—and the only material purpose for the inclusion of a bank statement was to confirm that aspect of a borrower's eligibility. 6/17 Tr. 178:2-178:3; 226:6-226:7. Second, as Special Agent Hagerman acknowledged, the Government produced no evidence that Ms. Hockridge (as opposed to Mr. Reis) made the

18

alteration to the statement. 6/18 Tr. 58:2-59:5. Finally, the Government presented no evidence that Ms. Hockridge ever reviewed the altered bank statement prior to its submission by Mr. Reis.

Those failures of proof likewise infect the Government's charge under Count Four, which pertains to the 2021 Body Politix loan. Each of the foregoing flaws in its theory for the knowing falsity of the 2020 loan apply equally to the 2021 loan, but in that case, not even the Government claims that Ms. Hockridge submitted or prepared that loan. Instead, as Special Agent Hagerman's summary slides demonstrated, the 2021 loan was indisputably submitted by Ms. Hockridge's husband. Ex. 65B; Ex. 76E, at 3. Thus, the Government has not produced any evidence from which a rational jury could conclude beyond a reasonable doubt that Ms. Hockridge "caused" the transmission of the wire described in Count Four.

### F.  The Government Failed to Prove a Pattern of Materially False Loan Applications

To demonstrate a pattern consistent with a conspiracy, the Government introduced testimony through its witnesses about a number of PPP loan applications that Ms. Hockridge helped facilitate. But it did ***not*** introduce evidence from which a reasonable factfinder could conclude, beyond a reasonable doubt, that those loan applications included materially false statements about the applicant's income or financial status. Absent such proof, this supposed pattern is little more than a scatterplot of disconnected data—there is no through-line establishing a conspiracy beyond a reasonable doubt.

With respect to loan applications submitted during PPP Round 1, the Government's evidence of false statements was that Blueacorn customers' loan applications listed different business payroll than what was reported on their business tax returns. But the Government did not present any evidence of ***which*** of the two documents was inaccurate. Indeed, as Special Agent Friedmann acknowledged, some borrowers affirmatively told the Government that the number on their loan application was correct, and the evidence showed that many taxpayers underreport

business income to the IRS. 6/12 Tr. 243:13-16. For **none** of these allegedly fraudulent loans did the Government subpoena (much less introduce at trial) bank records that would have demonstrated which of the applicants' reports of their business payroll was the correct one. In other words, the only evidence the Government introduced shows that some numbers on the borrowers' applications and their tax documents were **different**—not that the numbers in the applications were **false**. As to PPP Round 1, a rational fact finder could not find beyond a reasonable doubt that Ms. Hockridge submitted applications containing false information as to these borrowers. Some examples illustrate the point:

- **Steven Sampang**: The Government introduced evidence that Mr. Sampang claimed an annual income of $161,000 on his Schedule C. 6/13 Tr. 151:18–151:20. This would be consistent with Ms. Hockridge's observation that his "bank statement show[ed] hefty deposits." *Id.* at 151:1–151:9; Ex. 4D. While Mr. Sampang told Ms. Hockridge that he'd received only a single 1099 in 2019 for his photography business, reflecting under $600 in income, 6/13 Tr. 74:19–74:22,[3] the Government never introduced any evidence of what Mr. Sampang's **actual** income was. And as the Government's witnesses acknowledged, it is common for independent contractors and sole proprietors to receive income without receiving an accompanying 1099 from their customers. 6/18 Tr. 86:5-18. Yet Special Agent Friedemann never subpoenaed Mr. Sampang's bank statements to determine his income, had not "look[ed] thoroughly through the bank statement to determine where the income is coming from," and did not even contact Mr. Sampang about his application until April of 2025. *Id.* at 154:9–154:25; 238:12–239:3 ("Q: So as you're sitting here today, you can't tell us whether what Mr. Sampang told Ms. Hockridge is true or false? A: That is correct."). In other words, the Government did not provide **any evidence** that Mr. Sampang's business income was less than $161,000, so it did not establish that Ms. Hockridge submitted a false statement on his PPP loan application.

- **Oliver O'Connell**: Mr. O'Connell worked with Mr. Reis—**not** Ms. Hockridge—to submit a PPP loan application in 2020, which estimated $180,000 in independent contractor income. When interviewed during the course of the Government's investigation, Mr. O'Connell told the Government that $180,000 was "close" to what he actually made in 2019. 6/13 Tr. 192:13–192:16. But the Government did not establish what Mr. O'Connell's true income was, and Special Agent Friedemann again testified that he "d[idn't] know whether [Mr. O'Connell] lied to Mr. Reis or if he lied to [Special Agent Friedemann]." *Id.* at 195:15–195:16. Put simply, a reasonable factfinder cannot treat a confession of ignorance as evidence of falsehood.

---

[3]    This hearsay is inadmissible to prove the truth of the matter asserted.

- **Mark Sanor**: The Government's evidence as to Mr. Sanor was that a PPP loan application submitted by Blueacorn showed an independent contractor income one hundred thousand dollars larger than a 1099 he had received, with supporting documentation that had apparently been altered. 6/13 Tr. 15:16–15:19, 22:20–23:2. When the application with the altered income numbers was submitted to a bank and subsequently rejected, Ms. Hockridge texted Mr. Reis, "I know why Lendistry denied his application. Your Photoshop skills aren't very good." 6/13 Tr. 25:10–25:17. However, Special Agent Friedemann conceded that the Govnerment had no evidence Ms. Hockridge ever opened the files (much less that she opened them prior to submitting the loan application), *id.* at 294:10–294:13, and that he had no personal knowledge as to how much Mr. Sanor had actually earned in 2019 because he had not done anything to verify the numbers, *id.* at 197:25–198:5. Even construed in the light favorable to the Government, this evidence at most shows that Ms. Hockridge believed ***after the fact*** that Mr. Reis had altered Mr. Sanor's 1099 to submit to the SBA. It does not show that Mr. Sanor actually did not earn more income and that the application contained a false statement. As Mr. Flores and Special Agent Friedemann also conceded, some PPP borrowers had previously been reporting their income inaccurately to the IRS (because falsely reporting a lower income to the IRS would result in less taxes, but truthfully reporting such income on a PPP loan application could result in a larger loan). *See* 6/12 Tr. 243:17–244:13; 6/13 Tr. 197:6–197:10. Special Agent Friedemann did not interview Mr. Sanor to determine his true income.6/13 Tr. 200:15–200:17.

These examples illustrate a common theme: the Government seeks to prove fraudulent misstatements from nothing more than discrepancies between documents submitted to the IRS and documents submitted to obtain PPP loans. But the Government ***did not present any evidence*** showing which documents were true and which were false. As a result, with the evidence presented, to find the borrowers' PPP applications false, the jury would have to speculate as to which documents were accurate; it could not rationally conclude, ***beyond a reasonable doubt***, that Ms. Hockridge submitted any false statements to financial institutions on those applications.

## II.        The Government Failed to Prove the Wire Fraud Charges Beyond a Reasonable Doubt

The Government has likewise failed to prove Counts Two through Five of the Superseding Indictment beyond a reasonable doubt. Like the conspiracy charge, the Government failed to provide a single, unified scheme to defraud and thus deviated from the Superseding Indictment in

violation of the Fifth Amendment. The Government also failed to prove, beyond a reasonable doubt, that Ms. Hockridge knew that any loan application was materially false.

### A.  The Government Failed to Prove a Unified Scheme to Defraud

As explained above, the Fifth Amendment requires the Government to prove the allegations and charges in the Superseding Indictment, rather than seek a conviction based on unindicted charges or allegations. Here, the Superseding Indictment's wire fraud counts (Two through Five) allege a single, unitary scheme to commit wire fraud that overlaps with the single, unitary conspiracy charged in Count One. Superseding Indictment (Doc. #163) ¶ 19 (alleging that Defendants, Coconspirator-1, and others "devised and intended to device the scheme to defraud describe in paragraphs 15 through 17"). The Government was therefore obligated to prove that unitary scheme to defraud, not multiple courses of conduct. *See United States v. Camiel*, 689 F.2d 31, 36 (3d Cir. 1982) (holding that, unlike for a conspiracy charge, "it is the existence of a common scheme, and not any agreement among the parties to participate in it, that is critical" for a mail fraud charge). Yet, for the reasons identified above, "the [G]overnment's evidence, when viewed in the light most favorable to the [G]overnment, was insufficient for a rational juror to conclude beyond a reasonable doubt [that Ms. Hockridge and others] had devised or culpably participated in the unitary scheme to defraud alleged in the [Superseding] Indictment." *United States v. Gengler*, No. 1:08-cv-12, 2009 WL 5549225, at *17 (E.D. Va. Oct. 23, 2009).

For the same reasons identified above, the Government's decision to charge one unified scheme but prove multiple courses of conduct prejudiced Ms. Hockridge, which warrants a judgment of acquittal. *See id.* at *19–20. In particular, the Superseding Indictment's unified-scheme charge caused the admission evidence from a 2020 course of conduct that would not have been admissible against Ms. Hockridge if the Government had charged only the scheme relevant to her. *See Camiel*, 689 F.2d at 38 (holding that alleging one unified scheme but proving multiple

22

causes a "spillover of evidence"); *see also id.* at 39 (describing the prejudice resulting from the spillover of evidence). For that reason, the Court should enter a judgment of acquittal on the remaining counts of the Superseding Indictment.

### B. The Government Failed to Prove that Ms. Hockridge Knew That PPP Loan Applications Were Materially False

#### 1.   The Jury Cannot Rationally Conclude That Any False Statement was Material

The Government must prove in wire fraud cases that the underlying representations are materially false. *United States v. Velencia*, 600 F.3d 389, 426 n.11 (5th Cir. 2010) (citing *Neder v. United States*, 527 U.S. 1, 25 (1999) (holding that materiality is a distinct element of wire fraud)). A representation or statement is "material" if it has a natural tendency to influence, or is capable of influencing, the decision of the person or entity to which it is addressed. As the Supreme Court recognized in *Universal Health Services v. United States ex rel. Escobar*, where "the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." 579 U.S. 176, 195 (2016). While *Escobar* discussed the meaning of materiality under the False Claims Act, the Supreme Court explained that the definition of materiality under that statute was the same as other federal fraud statutes, including, as relevant here, the wire fraud statute. *Id.* at 192–93. Moreover, as the Supreme Court recently held, the wire-fraud statute's "'demanding' materiality requirement substantially narrows the universe of actionable misrepresentations." *Kousisis v. United States*, 145 S. Ct. 1382, 1398 (2025) (citing *Universal Health Services*, 579 U.S. at 194)).

Here, even if a reasonable factfinder could infer (rather than simply speculate) that Ms. Hockridge made or caused false statements on a PPP loan application, the Government's evidence would not allow the conclusion, beyond a reasonable doubt, that any such misstatement was

material. The possibility of fraud in PPP loan applications was obvious. *See* 6/16 Tr. 298:19–298:21. Yet the Government imposed minimal underwriting standards on lenders. *See* 6/16 Tr. 224:2–224:7. Accordingly, any misstatements made during the loan application process regarding adherence to the PPP's requirements were not material to the Government's decision to issue PPP loans because the Government ***knew or was aware*** that such misstatements were being regularly made but issued the loans anyway.

Moreover, as explained above, because reported earnings over $100,000 could not have increased the loan amount, the Government cannot demonstrate that any false statements of income in excess of $100,000 are material. 6/16 Tr. 273:1–273:6.

### 2. The Government Failed to Prove Knowledge or Intent

Even there were evidence that Ms. Hockridge made or caused materially false statements in loan applications, a rational jury could not reasonably conclude beyond a reasonable doubt that Ms. Hockridge did so with knowledge that the statements in any such loan applications were false at the time the applications were submitted. Because a knowing falsehood is a *sine qua non* of wire fraud, the Government's failure in this regard renders its proof on Counts Two through Five insufficient as a matter of law.

"Good faith is a complete defense to the crime of wire fraud if the defendant did not act with the intent to defraud. . . . The essence of the good faith defense is that one who acts with honest intentions cannot be convicted of a crime requiring fraudulent intent." Proposed Jury Instruction (Doc. #143) No. 26. Here, the Government has not presented evidence sufficient for a rational factfinder to find it beyond a reasonable doubt that Ms. Hockridge did not act in good faith when working for Blueacorn and operating VIPPP. Quite the opposite: as detailed above, the evidence overwhelmingly shows that she attempted to root out fraudulent PPP loan applications—***even though*** no rule or regulation required her to do so. *See, e.g.*, 6/13 Tr. 156:23–157:4; 173:23–

174:17; 194:21–194:5; 6/16 Tr. 95:22–95:24, 197:10–197:19; Ex. 35A, at 24-25; 6/19 Tr. 138:4-17.

The Government has introduced evidence of multiple fraudulent loans applications that borrowers submitted through Blueacorn or VIPPP. But Ms. Hockridge's failure to identify every false statement in every bad loan application does not demonstrate beyond a reasonable doubt that she acted with fraudulent intent. To the contrary, under the PPP regulations, she, like the lenders to whom the applications were submitted, was entitled to rely on the borrowers' certifications that they were telling the truth. *See, e.g.*, 6/16 Tr. 225:25–226:6. The Government also promised that lenders would be held harmless for any falsehoods in the loan application or the applicant's supporting documentation. 6/16 Tr. 242:11–242:17.[4] As the evidence adduced at trial showed, Ms. Hockridge acted as a referral source both to lenders and to Fin Cap, a lender service provider, in exchange for a portion of the statutorily provided lender fee, entitling her to the protections promised to such entities by Congress. 6/13 Tr. 242:11-17. As a result, Ms. Hockridge was entitled to rely, like the lenders she served, on the certifications of borrowers that their loan applications were true and accurate "in all material respects," and she was promised that she would be "held harmless" from liability for their misstatements so long as she acted in good faith. Allowing a conviction to stand on such a basis would vitiate the clear mandate of Congress, that borrowers,

---

[4]    Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act, Pub. L. 116-260, §305, 134 Stat. 1182, 1996–97 (Dec. 27, 2020) (codified at 15 U.S.C. § 636m(h)(2)) ("***HOLD HARMLESS*** . . . *A lender may rely on any certification or documentation submitted by an applicant* for an initial or second draw PPP loan . . . ." (emphasis added)); *Business Loan Program Temporary Changes; Paycheck Protection Program as Amended by Economic Aid Act*, 86 Fed. Reg. 3692, 3694–95, 3708 (Jan. 14, 2021) ("***SBA will allow lenders to rely on certifications of the borrower*** in order to determine eligibility of the borrower and use of loan proceeds and to rely on specified documents provided by the borrower to determine qualifying loan amount and eligibility for loan forgiveness. Lenders must comply with the applicable lender obligations set forth in this interim final rule, but ***will be held harmless for borrowers' failure to comply with program criteria*** . . . ." (emphasis added)).

and not those assisted lenders in processing their applications, would be held responsible for any material falsehoods in borrower applications.

True, the Government introduced testimony from Mr. Hochberg that he submitted fraudulent loan applications in 2020 and 2021, with help from Mr. Reis and Ms. Hockridge. 6/16 Tr. 310:10–310:23. But a rational factfinder could not conclude beyond a reasonable doubt that Ms. Hockridge knew that applications associated with Mr. Hochberg were fraudulent. Mr. Hochberg repeatedly distanced Ms. Hockridge from fraud. *See, e.g.*, 6/17 Tr. 27:21–27:24 (testifying that he did not speak with Ms. Hockridge about the fraud he was committing in his first PPP loan); *id*. 33:4–34:9 (testifying that he did not tell Ms. Hockridge about his business's financial status for his 2020 loan application); *id*. 56:16–20 ("Q: You don't think you qualified for this loan [in 2020]? . . . A: I don't think so, no. Q: All right. Is that something you told Stephanie [Hockridge]? A: No."); *id.* 66:19–20 (testifying that second loan application "did not involve Ms. Hockridge"); *id*. 78:10–12 (testifying that he never told Ms. Hockridge his payroll documents were false regarding his 2021 loan application); *id.* 83:4–83:11(testifying that he does not recall anything specifically that he said in front of Ms. Hockridge about committing fraud); *id.* 96:13–96:16 (testifying that he does not recall any communication with Ms. Hockridge where she instructed him to falsely state that any referral's income was $100,000); *id.* 106:6-106:9 (testifying that he did not talk openly in front of Ms. Hockridge about any fraud); *id.* 146:10-146:21 (testifying that he did not tell Ms. Hockridge that any information was false in the loan applications he submitted or that were submitted on behalf of his friends).

The Government also submitted testimony of IRS Special Agent James Hagerman, attempting to prove that Ms. Hockridge submitted a fraudulent loan application for Body Politix in 2021. But as Special Agent Hagerman conceded, Mr. Reis and A.T. discussed the loan without

26

including Ms. Hockridge on the communication. 6/18 Tr. 27:7–28:25; GX76E at 3, 5. He also admitted that he has seen no corroborating evidence showing that Ms. Hockridge was sent the application materials before they were submitted or that she caused the application to be sent. 6/18 Tr. 30:9–15; 31:9–22. All Special Agent Hagerman could say is that he "believe[d] there is evidence that, upon reading it, made [him] believe that Ms. Hockridge did participate in [the] application." *Id.* 29:25–30:5. Believe he may, but Special Agent Hagerman's beliefs—beliefs he apparently formed from reading documents and communications that he conceded had nothing to do with Ms. Hockridge—are not evidence of Ms. Hockridge's guilt, and certainly would not dispel a reasonable doubt. *Cf. United States v. Morris*, 568 F.2d 396, 401 (5th Cir. 1978) (noting that "an attorney's statement of his beliefs injects into the case irrelevant or inadmissible matter or facts not legally produced into evidence"). If Mr. Hagerman had evidence that substantiated his beliefs, he should have pointed to it. He did not. As a result, the Government failed to prove beyond a reasonable doubt that Ms. Hockridge knew about falsehoods in any loan applications it introduced at trial. For these reasons, the Court should enter a judgment of acquittal on the wire fraud charges.

### C.  The Government Has Failed to Prove That Ms. Hockridge "Caused" Any of the Wire Transfers Described in Counts Two Through Five

As explained above, the Government has failed to prove that Ms. Hockridge had any involvement in the submission of the 2021 Body Politix loan charged as Count Four. To the contrary, the Government's evidence plainly demonstrates that that loan application was prepared and submitted by Ms. Hockridge's husband with the assistance of A.T. As such, there is simply no evidence that Ms. Hockridge caused the submission of the loan application that resulted in the wire transfer described in Count Four.

Counts Two, Three, and Five are likewise infirm. Each of those counts relates to a loan application submitted on behalf of Devin Hochberg. The Government has not submitted evidence

capable of persuading a rational jury that she caused his applications to be submitted, thus rendering its proof on that element insufficient.

## III. The Government Has Failed to Prove Venue on Any of the Counts

### A. The Government Failed to Prove Venue Is Proper for the Conspiracy Count, Thereby Entitling Ms. Hockridge to Acquittal on That Count

In any criminal case, "the Government has the burden of establishing venue." *United States v. Fells*, 78 F.3d 168, 170 (5th Cir. 1996) (citing *United States v. Winship*, 724 F.2d 1116, 1124 (5th Cir. 1984)). Both the Constitution and the Federal Rules of Criminal Procedure guarantee that a defendant will be tried in the state and district where the crime is alleged to have been committed. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to . . . trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law."); Fed. R. Crim. P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."). Where a defendant faces multiple counts, the Government must prove venue is proper as to ***each*** of them. *See United States v. Davis*, 666 F.2d 195, 198 (5th Cir. 1982) ("Venue may properly be laid in one district with respect to one count of an indictment, but still be improper with respect to the other counts.") (citation omitted).[5]

Because the question of what acts constitute the "commission" of an offense, "the venue inquiry is intimately tied to the offense charged." *United States v. Strain*, 396 F.3d 689, 693 (5th Cir. 2005); *see also id.* ("[T]he venue inquiry hinges to a large extent on how we define the offense."). "In cases involving conspiracy offenses, venue is proper in any district where the

---

[5] The Government must establish venue for each count by a preponderance of the evidence. *United States v. Strain*, 396 F.3d 689, 692 n.3 (5th Cir. 2005).

agreement was formed or an overt act occurred." *United States v. Thomas*, 690 F.3d 358, 369 (5th Cir. 2012) (quoting *United States v. Garcia Mendoza*, 587 F.3d 682, 686 (5th Cir. 2019)).

Here, the Government cannot establish venue over the conspiracy count against Ms. Hockridge. Not once in this case has the Government presented ***any*** evidence (1) that the conspiracy charged was formed in the Northern District of Texas or (2) that an overt act in furtherance of that conspiracy was committed by a coconspirator within the Northern District of Texas. *Cf. United States v. Owens*, 724 F. App'x 289, 295–96 (5th Cir. 2018) (holding that Northern District of Mississippi was an improper venue for charging conspiracy to distribute methamphetamine where evidence only showed acts by the defendant in the Southern District of Mississippi).

To the contrary, the Government's evidence relates to acts that occurred in ***Arizona***, where Ms. Hockridge lived at all times relevant to the events alleged in the Superseding Indictment. For example, Mr. Flores testified that at all relevant times, (*i.e.*, "[d]uring Covid-19"), "it was no traveling [s]o it was all phone calls and emails." 6/12 Tr. 62:16–62:22. At most, the evidence showed that loan proceeds were disbursed by a bank in the Northern District of Texas—but that was not an affirmative act by Ms. Hockridge or any coconspirator, so it cannot provide an evidentiary hook to establish proper venue here. *See Strain*, 396 F.3d at 694 (explaining that "circumstance elements" of an offense, such as knowledge or acts by a third party that "do not involve any proscribed conduct by the accused" cannot "serve as a basis for establishing venue"); *United States v. Rodriguez-Lopez*, 756 F.3d 422, 430 (5th Cir. 2014) ("Venue is proper in conspiracy offenses in any district where the agreement was formed or an overt act occurred." (cleaned up)); *see id.* (holding that "[v]enue may be proper in districts in which conspirators have

29

never set foot" if "acts committed *by coconspirators* in furtherance of the conspiracy" took place in the district) (emphasis added) (cleaned up)).

Perhaps recognizing the weakness in its position, the Government elicited testimony from Mr. Flores that Mr. Reis sent *one text message* from an airport in Dallas, in which Mr. Reis asked Mr. Flores to confirm that Mr. Flores should attract customers through "a multitiered partner network." 6/12 Tr. 112; GX 27A, at 18. But this text message was not an overt act in furtherance of a conspiracy. Nothing in the text message itself suggests any connection to criminal activity. And as Mr. Flores himself testified, Blueacorn had legitimate operations that were separate and apart from any conspiracy between Mr. Reis and Mr. Flores regarding their own loan applications. *See* 6/12 Tr. 212:13-212:18 (testifying that legitimate borrowers would sometimes get caught up in underwriting); *id.* 213:12-213:17 (testifying that his job at Blueacorn included helping banks understand and resolve issues for legitimate loans*); id.* 243:7-243:12 (testifying that part of his job was to help legitimate borrowers understand how to structure their loans correctly).

Even then, all the message shows is confirmation of an act that had *already* been agreed to and which had not yet been performed. To accept such a statement as an "act in furtherance of a conspiracy" would stretch those words well beyond their plausible meaning.

Likewise, the Government introduced a text exchange from Ms. Hockridge, purportedly sent to Blueacorn customer Jessica Stackpoole on December 30, 2020, when Ms. Stackpoole sought information about loan processing. 6/12 Tr. 9:11–9:16, 10:19–11:2. Ms. Hockridge stated that she was in Dallas and would be returning to Arizona on December 31, 2020. *Id.* at (11:6–11:8). This introductory text message is not evidence of an act in furtherance of a conspiracy. Again, since the uncontroverted evidence shows that Blueacorn engaged in legitimate business practices. There is no reason to think that, on December 30, 2020, Ms. Hockridge's introduction

of Ms. Stackpoole in an email from Mr. Reis included any attempt, intent, or other overt act to further a fraud rather than a legitimate business act. Indeed, the Government did not introduce evidence that any application submitted by Ms. Stackpoole was false or fraudulent in any respect. And the mere fact that a business may engage in some criminal activity does not make every action performed by that business "in furtherance" of that criminal activity. *Cf. United States v. Miles*, 360 F.3d 472, 478–79 (5th Cir. 2004) (noting that even a "substantial level of fraud" does not necessarily transform a "legitimate business" into a purely fraudulent endeavor). Rather, it must be shown that the act in question specifically advanced the purposes of the conspiracy. *Cf. United States v. Cornet*, 195 F.3d 776, 783 (5th Cir. 1999) (holding a statement is not "in furtherance of the conspiracy" under Rule 801(d)(2)(e) "unless the statement advances the ultimate objects of the conspiracy").

In the parties' proposed charge, the Government argued that venue could be established by the overt act of "an innocent agent who is acting at a conspirator's direction." Proposed Charge (Doc. #143) at 66 n.41 (quoting *United States v. Perez*, 223 F. App'x 336, 340–41 (5th Cir. 2007)). But *Perez*, an unpublished decision, relied only on a treatise that itself quoted out-of-circuit authority. *See Perez*, 223 F. App'x at 341 & n.4 (quoting LaFave, Israel & King, *Criminal Procedure* § 16.3(f) (2d ed. 1999)), and it is inconsistent with the Fifth Circuit's definitive construction of the law of conspiracy in *United States v. Wieschenberg*, 604 F.2d 326, 331 (5th Cir. 1979) (stating that "[f]or a conviction of conspiracy, there must be proof of . . . an overt act committed *by one of the coconspirators* in furtherance of the conspiracy" (emphasis added)).

Yet even if *Perez* were controlling, other acts that the Government relies on to prove venue—transfers made by Happy State Bank—are not acts of any alleged coconspirators' "agents"; to the contrary, Happy State Bank is merely a depository branch for Capital Plus

31

Financial, the alleged victim financial institution, which was at arms-length from the borrowers, and yet further removed from Ms. Hockridge herself. *See* 6/12 Tr. 293:12–293:18. Because venue is only proper in a district in which a crime is committed, and because the crime of conspiracy is committed only if a ***coconspirator*** performs an overt act in furtherance of the conspiracy, venue over the conspiracy charge is not proper in this District. Thus, a judgment of acquittal must be entered for the Government's failure to establish venue for Count I.

### B.  The Government Has Likewise Failed to Demonstrate Venue for Any of the Wire Fraud Counts

Ms. Hockridge also challenges the venue over the wire fraud charges in light of the Government's failure to establish that she was within the Northern of District of Texas when she "caused" the transmission of the bank transfers described in Counts Two through Five. The Sixth Amendment guarantees that a defendant will be tried in the district in which "district wherein the crime shall have been committed." U.S. Const. amend. VI. Federal Rule of Criminal Procedure18 similarly provides that "the government must prosecute an offense in a district where the offense was committed." But in this case Government has introduced no evidence to suggest that Ms. Hockridge began, continued, or completed any of the offenses charged in Counts Two through Five in this district.

Instead, the Government appears to base its claim of venue on the allegation that a bank within this district, which is not alleged to have been a knowing participant in any scheme, sent a wire transmission. That is simply insufficient. *See Strain*, 396 F.3d at 694 (explaining that "circumstance elements" of an offense, such as knowledge or acts by a third party that "do not involve any proscribed conduct by the accused" cannot "serve as a basis for establishing venue"). The Government's argument appears to echo the theory rejected by the Supreme Court in *Loughrin v. United States*, 573 U.S. 351 (2014), in which the Supreme Court held that the mere fact that a

bank disbursed funds as a result of a fraudulent statement to a third party was insufficient to create federal jurisdiction for bank fraud. As the Supreme Court has long held, the bank, wire, and mail fraud statutes should be construed together. *See Neder*, 527 U.S. at 20. Indeed, especially given the complexity of the U.S. banking system, it would render the constitutional demand of the Sixth Amendment toothless to allow venue to be based on nothing more than the fortuity that a wire transfer happens to pass through a bank on its way from payor to payee, as the Government seeks to do here. *See Loughrin*, 573 U.S. at 362 (holding that bank fraud statute does not "cover every pedestrian swindle happening to involve payment by check, but in no other way affecting financial institutions.").

The Fifth Circuit denounced the venue theory the Government's advances here over 60 years ago. In *United States v. Boruff*, the defendants, while located in the Northern District of Georgia, fraudulently caused their victim to send money via wire from Michigan to Atlanta, in the Northern District of Georgia. 310 F.2d 918, 922 (5th Cir. 1962). The next day, the defendants sent the money via a second wire from Atlanta to a town in the Middle District of Georgia, where they were tried and convicted for wire fraud. *Id.* The Fifth Circuit vacated their convictions, holding that venue was improper: all of the Defendants' acts causing an "interstate transmission" were done and completed in ***Atlanta***. The subsequent transfer could not render venue proper in the Middle District of Georgia because 18 U.S.C. § 1343 requires "an *inter*state transmission," not an *intra*state transmission within the State of Georgia. *Id.* at 922–23 (emphasis added).

So too here, the Government's evidence ties the alleged wire fraud in Counts Two through Five ***solely*** to the District of Arizona, where Ms. Hockridge resided on each of the dates reflected in those counts. The Government has not introduced a shred of evidence that Ms. Hockridge began, continued, or completed the charged act of causing a fraudulent wire transfer while she was in the

Northern District of Texas, so it has failed to establish that venue was proper here. Even if Ms. Hockridge traveled to this district at some point between 2020 and 2021, that would not make venue proper here—any more than the *Boruff* defendant's second wire transfer would subject him to prosecution in the Middle District of Georgia.

In short, the Government had ample opportunity at trial to prove the Northern District of Texas was a proper venue for this prosecution. It simply failed to do so. Thus, Ms. Hockridge is entitled to judgment of acquittal on each count of the Superseding Indictment.

CONCLUSION

The Government has failed to prove a unified conspiracy or scheme to defraud. Likewise, the Government has failed to prove that Ms. Hockridge intentionally joined any conspiracy or knew about any materially false loan applications. And it has utterly failed to demonstrate that Ms. Hockridge committed any act in this district either in furtherance of the conspiracy or as one of the charged executions of the alleged scheme in Counts Two through Five. While the Government may have presented "some evidence" to suggest that Ms. Hockridge worked with others who have admitted to conspiring together to commit wire fraud, the Government has not presented sufficient evidence to persuade a rational jury ***beyond a reasonable doubt*** that she was a knowing participant in their fraudulent activities. For these reasons, Ms. Hockridge respectfully requests that the Court enter a judgment of acquittal on all counts.

Dated: June 19, 2025                          Respectfully submitted,

BRYAN CAVE LEIGHTON PAISNER LLP

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Tel: (314) 259-2000
Fax: (314) 259-2020

34

*richard.finneran@bryancave.com*

*Attorneys for Defendant Stephanie Hockridge*

GALLIAN FIRM

*/s/ Gregg Gallian*
Gregg Gallian, TX Bar: 24085952
3500 Maple Avenue, Suite 1150
Dallas, Texas 75219
Tel: (214) 432-8860
Fax: (972) 433-5835
*gregg@gallianfirm.com*

*Attorneys for Defendant Stephanie Hockridge*

## CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2025, a true and correct copy of the foregoing document was served on all counsel of record by operation of the Court's CM/ECF system.

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN